REBECCA    HENRIQUES    v.    THE    YPSILANTI    SAVINGS
BANK ET AL.

*Bills and notes—Fraud—Good-faith holder—Collateral security.*

Complainant was induced to sign two promissory notes as surety for the maker under such circumstances as prevented their enforcement except in the hands of an innocent holder, which notes were received and held by a bank as additional security to the maker's dishonored note.  And it is held that the bank parted with no value, and is not an innocent holder of the notes, and that equity will enjoin their collection.

Appeal from Washtenaw.    (Kinne, J.)    Argued November 21, 1890.    Decided December 24, 1890.

Bill to restrain defendant bank from collecting certain notes.    Defendant bank appeals.    Affirmed.    The facts are stated in the opinion.

*B. M. Thompson* (*J. F. Lawrence,* of counsel), for complainant, contended:

1. In support of the proposition that the notes were void as between the immediate parties, counsel cited *Jacox v. Jacox,* 40 Mich. 473; *Duncombe v. Richards,* 46 Id. 166, 169; *Thorn v. Thorn,* 51 Id. 167, 171; *Munson v. Carter,* 19 Neb. 293; *Hall v. Knappenberger,* 97 Mo. 509; *Ford v. Hennessy,* 70 Id. 580;

*Moses v. Noble*, 86 Ala. 407; *Connor v. Stanley*, 72 Cal. 556, 558; *Fisher v. Bishop*, 108 N. Y. 25.

2. Under the rule laid down in the foregoing cases, whoever takes the paper with notice of the fiduciary or confidential relationship existing between the holder and maker takes subject to all existing equities; and in this case Mr. Hemphill knew that the maker was rector of St. Andrew's Church, and that complainant was a member of that church, and an accommodation maker; they were the identical notes which he had filled out and sent to Mr. Earp; citing *Smith v. Kay*, 7 H. L. Cas. 750; *Berdoe v. Dawson*, 34 Beav. 603; *Kempson v. Ashbee*, 10 Ch. App. Cas. 15; and, aside from this, Mr. Earp must be regarded as the agent of the bank in this transaction; citing *Pidcock v. Bishop*, 3 Barn. & C. 605; *Owen v. Homan*, 3 Eng. L. & Eq. 112, 120; *Smith v. Osborn*, 33 Mich. 410; *Bank vs. Webb*, 56 Id. 377, 385.

3. The bank received and held the notes as collateral security merely to a pre-existing debt, and, having parted with no value, is not an innocent holder; citing *Stone v. Welling*, 14 Mich. 514; *Boxheimer v. Gunn*, 24 Id. 372; *Smith v. Osborn*, 33 Id. 410; *Spinning v. Sullivan*, 43 Id. 5; *Waterbury v. Andrews*, 67 Id. 281; *Burroughs v. Ploof*, 73 Id. 607.

*J. Willard Babbitt* (*Cutcheon, Stellwagen & Fleming*, of counsel), for appellant, contended:

1. As a matter of law, these notes could not have been held by the bank as collateral under the instructions in the letter of Mr. Earp, nor could it sue upon the Morris note; citing *Sage v. Walker*, 12 Mich. 425.

2. As to when a bill or note should be regarded as payment, see *Iron Works v. Hall*, 64 Mich. 169; and the taking of a new note in renewal is *prima facia* a payment; citing *Morrison v. Smith*, 81 Ill. 221; *Frazer v. Boss*, 66 Ind. 1; *Mehlberg v. Tisher*, 24 Wis. 607; *Matasce v. Hughes*, 7 Oreg. 39; *Curtis v. Hubbard*, 9 Metc. 322; *Wait v. Brewster*, 31 Vt. 516; *Ward v. Bourne*, 56 Me. 161; and if a holder receives security from the principal in satisfaction of the bill, it will discharge the surety, though the holder's rights against other parties are reserved; citing *Boultbee v. Stubbs*, 18 Ves. 20; Rand. Com. Pap. § 1823.

3. The bill does not allege, and there is no evidence tending to show, that the action of complainant in signing the notes was in the slightest degree influenced by any confidential relation existing between herself and the maker. The allegation and proof of the pastoral relation is not sufficient to raise a pre-

sumption of undue influence, which must be alleged and proved as a fact; citing *Jenkins v. Pye*, 12 Pet. 241; *Taylor v. Taylor*, 8 How. 183; *Conley v. Nailor*, 118 U. S. 127; *Mackall v. Mackall*, 135 Id. 167; *Audenreid's Appeal*, 89 Penn. St. 114; *Greenfield's Estate*, 24 Id. 240; *Herster v. Herster*, 122 Id. 239; *Coweer v. Cornell*, 75 N. Y. 100; *In re Smith's Will*, 95 Id. 516; *Fisher v. Bishop*, 108 Id. 25; *Bailey v. Woodbury*, 50 Vt. 166; *Woodbury v. Woodbury*, 141 Mass. 329; *Kerrigan v. Leonard*, 8 Atl. Rep. (N. J.) 503; *Brick v. Brick*, 44 N. J. Eq. 282; *Hemingway v. Coleman*, 49 Conn. 390; *Crowe v. Peters*, 63 Mo. 429.

4. The retention of the Morris note as collateral under the instructions of the letter was proper, and does not affect the question of payment; citing *Woods v. Woods*, 127 Mass. 141; *Gordon v. Price*, 10 Ired. 385; and the act of attaching the notes and letter together constituted a memorandum of the bank, which estops it from denying the acceptance of the notes in suit as a payment to the amount of $6,500, less the discount on the two notes; citing *Iron Works v. Hall*, 64 Mich. 169; Morse, Banks (2d ed.), 191; and a pre-existing debt is a valuable consideration; citing *Bostwick v. Dodge*, 1 Doug. 413; *Elliott v. Miller*, 8 Mich. 132; *Outhwite v. Porter*, 13 Id. 533; *Hanold v. Kays*, 64 Id. 439; and if one joint maker delivers the note, it is conclusively presumed he had authority from the other to do so; citing *Beman v. Wessels*, 53 Mich. 549; and the surrender of an overdue note by an indorsee to an indorser is such a valuable consideration as will hold his indorser on a new note given to take up the old one; citing *Bromley v. Hawley*, 60 Vt. 46; and the release of Mrs. Morris, and the relinquishment of the right to sue Mr. Earp, each constitute a valuable consideration; citing *Bank v. Bridgers*, 98 N. C. 67; *Smith v. Van Loan*, 16 Wend. 659; *Williams v. Little*, 11 N. H. 66; *Barney v. Earle*, 13 Ala. 106; *Bond v. Bank*, 2 Ga. 92; *Robinson v. Lair*, 31 Iowa, 9; *Bank v. Heald*, 25 Md. 562; *Bardsley v. Delp*, 88 Penn. St. 420; *Stedman v. Carstairs*, 97 Id. 234; *Royer v. Bank*, 83 Id. 248; *Bank v. McClelland*, 9 Colo. 608.

GRANT, J. This is a suit in equity to enjoin the defendant the Ypsilanti Savings Bank from enforcing the collection of two promissory notes for $2,500 and $4,000, respectively. They were executed by Samuel Earp and complainant, the latter signing only as surety for Mr. Earp, and were payable to the order R. W. Hemphill, cashier of the defendant bank. Mr. Earp was at the

time, and had been for several years, rector of the Episcopal Church, at Ann Arbor, where complainant resided. She was his parishioner, and a communicant of his church.

On April 19, 1889, the bank held a note for $6,500, executed by Mr. Earp and Victoria C. Morris, which was then two months past due. This note was discounted for the sole benefit of Mr. Earp. Mrs. Morris, a married woman, was merely a surety, and received no benefit or consideration. When it became due, she declined to renew it. The bank sent Mr. Batchelder, its president, to Ann Arbor, to see Mr. Earp in regard to the matter. On his return, he directed Mr. Hemphill to send to Mr. Earp two notes, one for $2,500, payable in 10 days, and one for $4,000, payable in 30 days, which were the notes now in dispute. The notes, dated April 15, were sent, and on April 19 were returned to the bank, signed by Mr. Earp and complainant, and accompanied by the following letter:

"ST. ANDREW'S RECTORY, ANN ARBOR, MICH.,
"April 19, 1889.

"*My Dear Friend:* I went to see Mrs. M., as Mr. B. requested yesterday afternoon, but found that she had promised her husband during his sickness that she would not sign any more papers for any one. This was occasioned by a loss sustained through another party. She feels that her promise is sacred, and she is so completely crushed anyhow that I could not press the matter any further. I return two notes signed by Miss Henriques, who is just as responsible, and whose funds, perhaps, are in a more available shape. You can retain the other papers as a sort of collateral, Mrs M. having no objection to them as they are, and to her responsibility until they are paid. I hope this will remove your immediate difficulty. I have word this morning that the funds will be on hand within a few days, and all settled. I regret the inconvenience to Mr. B. of coming up here twice. If there is any expense attached to it, please charge it to me.                           Yours very truly,
                              "S. EARP."

Upon the receipt of these notes, Mr. Hemphill, the cashier, pinned them to the Morris note, put them in an envelope, and in this condition has always kept them. The bank made no entry whatever of the Henriques notes upon any of its books or records. No entry is made in the book of discounts, or the register of bills payable. Mr. Earp had an account with the bank, including the Morris note, but no credit is given him thereon. No indorsement of payment is made upon the Morris note. There is nothing whatever in any record or paper of the bank to indicate that these notes had been discounted, or that they had ever been classified as discounted paper. The only testimony on the part of the bank to show that they were discounted, or that the bank parted with value, comes from Mr. Hemphill, who testified that they were received in payment *pro tanto* upon the Morris note. If so received, only a few dollars of interest remained due upon the Morris note. But there are other significant facts shown by the evidence, bearing upon this question. Mr. Hemphill testifies that, after the receipt of these notes, he held the Morris note under the instructions in the letter above given,—

" As a sort of collateral to the balance of interest that was due on this [the Morris note] and some other little matters that he owed me."

The instructions in the letter are:

" You can retain the other papers [meaning the Morris note] as a sort of collateral, Mrs. M. [meaning Mrs. Morris] having no objection to them as they are, and to her responsibility until they are paid."

Mr. Earp was at this time indebted to the bank, aside from the Morris note, to the amount of several hundred dollars. Mr. Hemphill says that he held the Morris note, expecting to squeeze him on the other matters if he could.

He admits having told Mrs. Morris in June, when she came to see him about her note, that she and Miss Henriques had better fix the matter up some way among themselves. He also gave similar advice to Mr. Jones, the agent of Miss Henriques, and admits that he might have said that the best arrangement was for each to pay one-half. To neither of these did he state that the Morris note, or any portion of it, was paid. In these interviews he treated it as a full and subsistent obligation. About the time of this interview between Mrs. Morris and Mr. Hemphill, the dishonest transactions of Mr. Earp, at Ann Arbor, had been exposed. The sheep's clothing had been removed, and the wolf, in the garb of the priest, appeared in his true character. It was evidently in consequence of this that Mrs. Morris went to the bank to ascertain what her liability was. She is a lady of the highest character, was not cross-examined, and entirely disinterested as between the real parties to this suit. It does not appear whether she knew that she was not liable upon the note because of her coverture. If she did not, then her testimony was against her supposed interest. Her testimony is as follows:

"I told Mr. Hemphill that I came to see if I was involved in any way through Mr. Earp's transactions. Mr. Hemphill told me that there was a note which I had signed in his favor, but that, since my note had been signed, Miss Henriques had also signed a note, which he held as additional security. * * * Mr. Hemphill told me that he held me jointly responsible with Miss Henriques for the payment of the note."

Mr. Hemphill admits informing her that he still held her note as collateral, but says:

"Mrs. Morris is mistaken in the notes that I held. That is all. I told her that I held them according to Dr. Earp's letter; her note, under his instructions, as collateral security for *anything* that he owed."

He testifies that he supposed he could so hold it, and did hold it with that understanding until after this suit was brought. About this same time complainant, hearing rumors about these papers, went to Ypsilanti, first to the National Bank, and then to defendant's bank, and was informed by Mr. Hemphill that he had Mrs. Morris' note too.

The complainant is a maiden lady, upwards of 50 years of age, and possessed of considerable property. She had had considerable experience in loaning her money, and had received notes, bonds, and mortgages. She had never signed a note before the ones now in suit. Previously to this, Mr. Earp had so secured her confidence that he had borrowed from her at one time $1,000, at another, $250. On the morning of April 19, 1889, being Good Friday, he called at complainant's home. Her statement of what there took place is as follows:

"He said he had a little matter, a little investment, I think, in Ypsilanti. He would like to ask a favor of me. He said he knew I was a pretty good friend of his. I said I hoped so, and he wished me to sign these papers. He asked me if I would sign a paper. I said, 'Yes.' Then I went up stairs to get pen and ink, and he put the paper on the table, near the end of the room, that stood at the right hand of me, and I commenced to sign the paper, and it was a very uncomfortable position, and I sat down on the sofa, close by the table, with the paper on a book, and he immediately came over in a very quick manner, and seated himself right beside me in a very flurried, quick manner, and I signed the paper. When I had signed that paper, he put another one on the book, with the left part of it turned over, the left corner of it turned over, and his hand around in this fashion [witness shows], and said that there was another one to sign; one was to send away, and the other was to keep. He was sitting at the right of me. He put his hand in this way over the paper."

The first paper signed was evidently the note for $2,500; for she says she saw upon that the words "twenty-five,"

but nothing more except Mr. Earp's name. The other paper, which was the note for $4,000, was turned over, and held by Mr. Earp in such a manner as largely to conceal its contents. He made no explanation of the purpose or character of the papers, and she asked no questions. She testified that she supposed it was a church matter, and that she did not think it had any reference to bank business, or bank-notes, or anything of the kind; nor did she believe that they involved any pecuniary liability on her part. A very long and rigid cross-examination does not impeach her evidence as above given. Mr. Earp testifies:

"I took the papers to her, and asked her to sign them, and she signed them. I did not tell her what they were. I said I had some papers that I wanted her to sign, and she signed them. I don't remember that she ever signed any other papers with me. I told her that I had a little personal matter at Ypsilanti. I cannot swear, or state positively, what I said to her."

It is unnecessary to detail his testimony; for, in my judgment, his character, as shown by the record, is such as to forbid any confidence in it. He was produced as a witness by the bank, and Mr. Hemphill testifies that the money, obtained by him from the bank, was obtained under false pretenses. The learned circuit judge, who heard the case in open court, and saw the witnesses, says, in his opinion:

"It is incontestable that this maiden lady reposed the fullest confidence in the Rev. Samuel Earp, and, as her rector and spiritual adviser, trusted him most implicitly. To have doubted his honesty, or questioned the rectitude of his intentions, was as foreign to her thoughts as to have denied the sacredness of his high office. To her, he was the embodiment and representative of holiness in human conduct.    *    *    *    It is clear that, as between the complainant and Mr. Earp, this transaction cannot stand for a moment in a court of equity."

A niece of the complainant was visiting her at the time she signed these papers. Whether or not she was present in the room at the time does not appear, but, on cross-examination, complainant testified that immediately after signing the papers she had a conversation with this niece, who told her that she should always look at anything before she signed it, and that complainant replied that, if she could not trust her minister, she could not trust any one.

Mr. Hemphill was acquainted with Mr. Earp, and knew that he was rector of St. Andrew's Church, at Ann Arbor, the only Episcopal Church in the city. He knew Mrs. Morris, who lived in Ann Arbor, and that she was a married woman. Under his direction, the bank had, for some months, been discounting paper for Mr. Earp with Mrs. Morris as surety, which finally resulted in the $6,500 note, which she declined to renew. He had known complainant for 30 years, and knew that the relation of priest and parishioner, if not communicant, existed between her and Mr. Earp. Whether or not these circumstances were sufficient to put the defendant upon inquiry, as to the *bona fides* of the transaction between complainant and Mr. Earp, *quære.* It is not necessary now to pass upon the question.

I concur fully in the opinion of the circuit judge that the transaction between complainant and Mr. Earp was fraudulent. These notes cannot be enforced, except in the hands of an innocent holder. He who has not parted with value is not such a holder. If these notes were received by defendant in payment of the Morris note, then the defendant parted with value; otherwise not. If $6,500 was paid by them upon the Morris note, then that note was worthless *pro tanto*, and could not be used by the defendant for any purpose whatever, except to the

extent of the few dollars of interest which had accrued after its maturity. The testimony of Mr. Hemphill is utterly inconsistent with the idea that he used it as collateral only to the extent of this unpaid interest. He must be held to know that a paid note could not be held as collateral. The very terms of the letter, which Mr. Hemphill, in behalf of the bank, followed, did not contemplate the discharge of Mrs. Morris; but, on the contrary, expressly stated that she would remain responsible upon it. The letter contains no reference to any other debts of Mr. Earp other than that represented by the Morris note. The authority contained in the letter to hold that note as collateral must be held to refer to the new notes transmitted therewith. The theory of defendant in treating it as paid, and still as collateral, would be a legerdemain in banking without precedent. In my judgment, the evidence in this case leads to but one conclusion, viz., that these notes were not received in payment, but that they were received as additional security to the Morris note. The defendant bank has parted with nothing, and is not therefore an innocent holder. The notes were obtained by fraud, and courts of equity will restrain their collection.

The decree is affirmed, with the costs of both courts.

The other Justices concurred.